UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEVIE B. TATUM,

                            Plaintiff,

            - against -

THE CITY OF NEW YORK, CORRECTION
OFFICER RENEE JACKSON, individually and
in her official capacity, and TERREEM
MARTIN,

                            Defendants.

**MEMORANDUM OPINION
AND ORDER**

No. 06-cv-4290 (PGG)(GWG)

PAUL G. GARDEPHE, U.S.D.J.:

            In this action, Plaintiff Stevie Tatum seeks relief under 42 U.S.C. § 1983
and New York state law for severe injuries he suffered as a pre-trial detainee when he
was assaulted by other inmates at Rikers Island.  (Second Amended Complaint
("Cmplt.") (Docket No. 29) ¶¶ 1-3)  He alleges, inter alia, that Defendant Renee Jackson,
the correction officer on duty in his Rikers Island dormitory at the time of the assault,
was deliberately indifferent to the assault; conspired with the inmates who assaulted him;
and aided and abetted the assault.  (Id. ¶¶ 10, 50-59, 73-74)  Following a five-day trial, a
jury rendered a verdict in Tatum's favor against Jackson and awarded Tatum $1 million
in compensatory damages.  The Court entered judgment against Jackson on July 30,
2009.  (Docket No. 94)  Now pending before the Court is Jackson's motion for judgment
as a matter of law or, in the alternative, for a new trial.  (Docket No. 96)  For the reasons
stated below, Jackson's motion is DENIED.

## DISCUSSION

## I.    BACKGROUND

### A.    Tatum's Claims

Tatum's Complaint asserted claims against Jackson, the City of New York (the "City"), and Terreem Martin, one of the inmates who allegedly assaulted him.[1] (Cmplt. ¶¶ 50-60)  Jackson and the City moved for summary judgment, which was granted in part.  (Docket No. 44)  All claims against the City were dismissed, although it remained potentially liable under a respondeat superior theory in connection with aiding-and-abetting assault and battery claims against Jackson.  (Id. at 31)  Tatum proceeded to trial on a Section 1983 deliberate indifference claim against Jackson; a Section 1983 conspiracy claim against Jackson and Martin; a Section 1983 excessive force claim against Martin and a related aiding-and-abetting claim against Jackson; state law assault and battery claims against Martin; and related state law aiding-and-abetting claims against Jackson.  (Id. at 31)

### B.    The Evidence At Trial

At trial, the parties did not dispute the following facts:  As of April 28, 2005, Tatum was being detained at Rikers Island as a result of a DWI charge on which he could not make bail.  (Tr. 476:12-15, 493:1-25)  On April 28, after attending the first day of his trial on the DWI charge, Tatum missed the regular bus back to Rikers Island from the courthouse, and he did not arrive back at his assigned dormitory (referred to as "Mod

---

[1]  Tatum also asserted claims against a second inmate who allegedly assaulted him, Leonard Chin.  (Cmplt. ¶¶ 56-59)  He was unable to locate Chin, however, and did not pursue those claims at trial.  (See Docket No. 61 (joint pre-trial order))

2") until approximately 3:30 a.m. on April 29.  (Tr. 494:1-11)  Defendant Jackson was the correction officer on duty in Mod 2 at that time.  (Tr. 184:13-17)

The parties also did not dispute that Tatum was severely injured by other inmates in the early morning of April 29.  As explained by Tatum's medical expert, Dr. Richard Sullivan, Tatum suffered two fractures in his jaw bone and fractures on either side of his upper nasal bones.  (Tr. 364:17-20, 368:10-14)  The first jaw fracture was sustained on the upper right side of Tatum's face, near the joint where the jaw hinges.  (Tr. 364:20-365:3)  The second fracture – in Tatum's lower jaw bone – was a "comminuted and open fracture" – i.e., Tatum's lower jaw bone was fractured into several pieces.  (Tr. 367:13-368:3)  Dr. Sullivan testified that the first fracture of Tatum's jaw was caused by "[a] very substantial direct blow" and would cause "severe pain" (Tr. 365:18-24, 366:7-25), and the second fracture was caused by a "very, very strong blow," and would hurt in the range of a nine or ten on a scale of "ten being the worst [pain] you could imagine."  (Tr. 369:9-14, 370:1-5)

The parties' testimony diverged on other key issues, including the events leading up to Tatum's injury and whether he had been assaulted once or twice by other inmates.

### 1.    Tatum's Testimony

Tatum's version of the events of April 29 was as follows:  When Tatum entered Mod 2, Jackson was conversing with other inmates.  (Tr. 497:3-7)  Tatum went to the bed he had been assigned (Bed 34), but found it occupied.  (Tr. 498:1-10)  When Tatum reported this to Jackson – who was sitting at her post – she responded that he should take Bed 36.  (Tr. 498:11-17)  Tatum found that Bed 36 did not have a second mattress – which he had been prescribed due to a back injury – and complained to

Jackson.  (Tr. 499:1-8, 501:3-9)  Jackson responded that there was nothing she could do about it, and other inmates then "began to make fun and ridicule" Tatum.  (Tr. 502:1-7) Jackson told the inmates that they were "acting like children."  (Tr. 502:12-20)  Tatum, who had returned to Bed 36, expressed his agreement with Jackson by saying "word." (Tr. 502:12-503:5)

The inmate in the bed next to Bed 36 (Bed 30) asked Tatum why he had agreed with Jackson, and Tatum said that he was not talking to the inmate.  (Tr. 503:10-506:6)  Jackson told them: "You guys need to shut the fuck up."  (Tr. 506:10-13)  The inmate responded, "You need to shut the fuck up."  (Tr. 506:14-17)  Jackson asked what was going on, and the inmate told Jackson that Tatum was "popping shit" at her – i.e., "disrespecting" her.  (Tr. 506:14-25)  Jackson "became irate" and began "spew[ing] profanities."  (Tr. 507:8-9)  Jackson moved toward Tatum's bed, "cussing" and saying "I don't know this mother fucker, who the hell he think he is, he don't disrespect me in my house."  (Tr. 507:17-24)  Another inmate moved to block Jackson, and the inmate in Bed 30 jumped up towards Tatum, who rolled off his bed onto the floor.  (Tr. 508:4-21, 509:3-10)  The inmate in Bed 30 and the inmate who had blocked Jackson jumped on Tatum and started "punching and kicking" him, while Jackson continued to "curs[e] and talk[] crazy."  (Tr. 509:11-16)

After "a few minutes," the attack stopped.  (Tr. 511:13-16)  Tatum went into the bathroom (Tr. 512:6-8), while Jackson continued to curse (Tr. 513:15-514:11). Tatum's mouth and nose were "bleeding profusely" at that point.  (Tr. 515:6-7)  While Tatum was at the sink cleaning up, the inmates who had attacked him came into the bathroom and "immediately started punching" him, and a crowd gathered.  (Tr. 517:10-

4

25)  It was during the second attack that Tatum felt the blows to his jaw, one of which knocked him into the wall.  (Tr. 518:8-24)  This attack was "very brief."  (Tr. 519:2-4)

   The altercation caught the attention of a correction officer in the "bubble" – an enclosed office between Mod 2 and another dormitory, which had windows into the dormitories – who "banged on the window" and then entered Mod 2 and separated Tatum from his attackers by moving Tatum into a vestibule outside Mod 2.  (Tr. 520:1-8, 20-23)  At about the same time, a group of officers in protective gear entered.  (Tr. 520:15-19)  A supervising officer came down, went into Mod 2 for a few minutes, and returned to the vestibule.  (Tr. 521:6-18)  Tatum was "in excruciating pain," his jaw was beginning to swell, and he was bleeding.  (Tr. 521:4, 521:22-25, 523:13-19)  He asked the supervising officer for medical attention, and the officer responded:  "You disrespect my officer then when you get your ass kicked you expect us to come and help you?"  (Tr. 521:25-522:2)  After a "substantial amount of time," Tatum was taken to the infirmary.  (Tr. 523:13-524:1)

   Tatum's fractured jaw caused intense pain during the year following the assault, and required two surgeries to repair.  (Tr. 539:13-540:5, 540:16-541:8, 542:1-4)  After the first surgery, his jaw was wired shut for eight weeks.  (Tr. 373:9-14)  The jaw did not heal properly, however, and a year after the assault, his jaw was sawed open and reset, and then wired shut for another eight weeks.  (Tr. 374:21-375:1, 376:7-16, 377:20-22; PX 5 at NYC 342-48)  Ultimately, Tatum's jaw was secured through the insertion of four metal plates and 16 screws in his face.  (PX 5 at NYC 342-48)  He continues to suffer chronic pain; his teeth are falling out due to bone loss; and he has only a limited ability to chew food.  (Tr. 379:7-11, 552:1-20, 554:21-556:16, 556:23-557:25)

### 2.    <u>Jackson's Testimony</u>

Jackson's account of the altercation was much different than Tatum's. She testified that Tatum was involved in one fight, near his bed, which started because other inmates were annoyed that Tatum was being noisy and ended when she told the inmates to stop fighting.

According to Jackson, a few minutes after Tatum arrived at Mod 2, he asked to take a shower, and Jackson told him that he could not.  (Tr. 277:9-20)  Tatum began cursing at her, and she "cursed right back at him."  (Tr. 278:3-6)  Several inmates asked them to lower their voices.  (Tr. 278:17-23)  Jackson testified that a fight then began:  "Before I knew anything [Tatum] said something to one of the guys in the house, . . . and before I knew anything, couple of seconds I just seen fists going, they just started fighting."  (Tr. 279:9-13)  Although Jackson was only six or eight feet away from Tatum, she did not see who started the fight because she was writing in her logbook at the time. (Tr. 329:13-330:8)

Jackson "gave [the inmates who were fighting] several verbal commands for them to stop fighting," which they did.  (Tr. 279:19-22)  The fight lasted "[a] few seconds."  (Tr. 280:1-3)  Then the officer in the bubble turned the lights on and "[e]verything . . . ceased."  (Tr. 280:4-9)  Jackson took Tatum outside the dormitory "for his own safety."  (Tr. 280:8-15)

### 3.    <u>Other Witnesses' Testimony</u>

Defendant Terreem Martin and Correction Officer William Buford also testified at trial, but neither witness corroborated either version of events, because each claimed not to have seen the assault or assaults.  Martin testified that he went to sleep at 10:00 or 10:30 p.m. after taking medication for depression and did not wake up until the

lights were turned on and the officers in protective gear came into the dormitory.  (Tr. 854:1-6, 855:22-25)  Buford – the officer in the bubble – testified that he heard "thumping" and heard Officer Jackson "yell . . . something to the effect of stop, stop fighting."  (Tr. 752:3-6)  He then turned on the lights and – from the bubble – observed three inmates near his window.  (Tr. 753:24-754:11)  When Buford first became aware of the "thumping," however, his back was turned to the windows overlooking Mod 2.  (Tr. 770:11-20)  He acknowledged that he did not see how Tatum's injuries were sustained. (Tr. 779:1-4)

### C.   **The Verdict**

The jury found that Tatum had not proven any of his claims against Martin, who pursued a misidentification defense at trial.  (Tr. 988:25-989:1, 1120-25) Therefore, the jury did not consider whether Tatum had proven the conspiracy claim or the aiding-and-abetting claims against Jackson.  The jury did find, however, that Tatum had proven his deliberate indifference claim against Jackson.  (Tr. 1119:21-25)  The jury awarded Tatum $1 million in compensatory damages on that claim, but did not award any punitive damages.  (Tr. 1121:12-18)

## II.   **JACKSON IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW**

Jackson seeks judgment as a matter of law with respect to Tatum's deliberate indifference claim.  (Def. Br. at 5-13)  The standard for granting judgment as a matter of law under Rule 50 is "well established":

> Judgment as a matter of law may not properly be granted
> under Rule 50 unless the evidence, viewed in the light most
> favorable to the opposing party, is insufficient to permit a
> reasonable juror to find in her favor.  In deciding such a
> motion, the court must give deference to all credibility
> determinations and reasonable inferences of the jury, and it

> may not itself weigh the credibility of witnesses or consider
> the weight of the evidence . . . .  Thus, judgment as a matter
> of law should not be granted unless
>
> (1) there is such a complete absence of evidence supporting
> the verdict that the jury's findings could only have been the
> result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in
> favor of the movant that reasonable and fair minded
> [persons] could not arrive at a verdict against [it].

Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998)

(internal citations omitted) (quoting Cruz v. Local Union No. 3, 34 F.3d 1148, 1154 (2d.

Cir. 1994)); see also Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133-34 (2d Cir. 2008)

(same).[2]

Jackson argues that the evidence was insufficient for the jury to find two

elements of the deliberate indifference claim:  (1) that she actually knew of a risk of

substantial harm to Tatum, and (2) that she disregarded such a risk.[3]  (Def. Br. at 6-13)

---

[2]  Rule 50 provides that "a party may move for judgment as a matter of law . . . during
trial at any time prior to the submission of the case to the jury" and, "[a]fter an
unfavorable verdict," may "renew its motion."  Galdieri-Ambrosini, 136 F.3d at 286
(internal quotation omitted).  "The posttrial motion is limited to those grounds that were
'specifically raised in the prior motion. . . .'"  Id. (internal citation omitted).  Jackson
satisfied these requirements by moving at the close of Tatum's case for judgment as a
matter of law on the deliberate indifference claim, on the grounds that, inter alia, "no
reasonable juror would find that . . . [she] was actually aware of a substantial risk or
inference of a substantial risk of harm to plaintiff, nor could . . . a reasonable juror find
that she, through that inference, . . . then disregarded his safety and welfare."  (Tr. 731:8-
12)  Jackson renewed her motion at the close of Defendants' case.  (Tr. 873:13-17)

[3]  Jackson does not challenge the Court's jury instruction concerning the elements of the
deliberate indifference claim.  The Court instructed the jury that to return a verdict in
Tatum's favor, it must find, inter alia, that Tatum had proven that Jackson:  "(1) was
actually aware of facts from which an inference could be drawn that there was a
substantial risk of harm to the plaintiff; (2) drew the inference that plaintiff was at risk of
harm; and (3) nevertheless disregarded the risk to plaintiff's health or safety."  (Tr.
1048:13-18)

Crediting Tatum's testimony over Jackson's, however, the jury could reasonably have found that Tatum proved both elements by a preponderance of the evidence.  Viewing the evidence "in the light most favorable" to Tatum and "giv[ing] deference to all credibility determinations and reasonable inferences of the jury," Galdieri-Ambrosini, 136 F.3d at 289, the Court finds that Jackson is not entitled to judgment as a matter of law.

> **A.    There Was Sufficient Evidence for the Jury
> To Find That Jackson Had Actual Knowledge
> of the Risk of Harm to Tatum**

In her memorandum of law in support of her motion, Jackson focuses primarily on whether the evidence supports a finding that she knew that Tatum was at risk of harm with respect to the first assault.  (Def. Br. at 6-9)  Whether or not the evidence supports such a finding, however, Jackson is not entitled to judgment as a matter of law on the knowledge element.  If the jury credited Tatum's version of events – i.e., if it found that he was assaulted a second time in the bathroom and that his severe injuries occurred at that time – it could also have reasonably found that Jackson knew or inferred that Tatum was at risk of harm with respect to the second assault.[4]  That finding

---------------

[4]  In deciding this motion, the Court does not make credibility determinations, but instead "give[s] deference to all credibility determinations and reasonable inferences of the jury." Galdieri-Ambrosini, 136 F.3d at 289.  The Court notes, however, that there were ample reasons for the jury to conclude that Jackson's testimony was not credible.

For example, at her deposition two years prior to trial, Jackson stated that she only remembered the April 29 incident "according to [her] paperwork," and did "not really" remember what happened.  (Tr. 188:3-4, 188:23-189:10)  At trial, however, Jackson claimed that she actually remembered the incident and had given contrary testimony at her deposition only because she had been tired.  (Tr. 187:23-188:15)  Despite this claim, when asked if she remembered the name of one of Tatum's alleged attackers based on anything other than her paperwork, she responded:  "I don't remember the inmate, I couldn't tell you what he looked like today, I wouldn't know."  (Tr. 207:8-9)  Jackson also acknowledged that she did not remember what Terreem Martin looked like from 2005.  (Tr. 311:15-312:8)

would be sufficient to establish the knowledge element of the deliberate indifference claim.

### 1.      There Was Sufficient Evidence for the <u>Jury To Infer Actual Knowledge</u>

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." <u>Farmer v. Brennan</u>, 511 U.S. 825, 842 (1994); <u>see also</u> <u>Ingram v. Steel</u>, No. 04-Civ.-5918(DLC), 2006 WL 2349241, at *3 (S.D.N.Y. Aug. 15, 2006) (knowledge necessary to support deliberate indifference claim against prison employees could be inferred from "the obviousness of the risk posed by a large hole in the shower area").

Here, a rational jury could easily have found that – given the first assault – there was an obvious risk that Tatum would be assaulted a second time after the two inmates followed him into the bathroom.  According to both Tatum and Jackson, Jackson was well aware of the first fight.  (<u>See</u> <u>supra</u> pp. 4-5)  The testimony and photographs of Mod 2 that were offered into evidence also showed that during the events in question,

_____

As another example, Jackson testified that she did not know on the night of April 29 that Tatum had been injured.  (Tr. 190:20-21, 191:1-5)  To impeach her testimony, Tatum offered into evidence a document entitled "Injury to Inmate" report, dated April 29, 2005.  This document referred to Tatum and contained Jackson's signature and shield number after the words, "I did witness this injury."  (Pltf. Ex. 10)  Jackson testified that she had not signed her name to the document and had never seen it before, although she claimed that she had in fact completed an "Injury to Inmate" report for Tatum on April 29.  (Tr. 194:5-195:7)  There was also evidence that Tatum's injuries were highly visible: Indeed, Jackson's counsel elicited testimony that when Tatum arrived at court later in the morning of April 29, the judge observed his condition and "asked [him] what happened, [he] told her [he] was assaulted, and she apologized . . . for what happened."  (Tr. 633:10-16)

Jackson was in a location from which she would have seen the bathroom entrance.  (E.g., Tr. 329:13-330:8 (Jackson's testimony that the first fight occurred six or eight feet away from her post, where she was writing in her logbook); Tr. 498:11-17, Tr. 507:17-24 (Tatum's testimony that before the first fight, Jackson was approaching his bed from her post, but was restrained by another inmate)); (Ex. 21-38, 40, 42, 44-47 (photographs of Mod 2 showing that dormitory was open room and that bathroom entrance was near Jackson's post)).  Thus, if the jury believed – as it was entitled to believe – that Tatum's assailants followed him into the bathroom within minutes of the first assault, it could reasonably have inferred that Jackson saw them and that the risk of a second assault was obvious.  See Murchison v. Keane, No. 94-Civ.-466(CSH), 1996 WL 363086, at *7 (S.D.N.Y. July 1, 1996) (if true, plaintiff's allegations that prison official had notice that plaintiff had recently been robbed at knifepoint in particular prison block, and did not want to be transferred back into that block, would establish knowledge element of deliberate indifference claim).

Jackson, of course, was free to present evidence that she was "unaware even of an obvious risk" to Tatum's safety, for instance by "show[ing] . . . that [she] did not know of the underlying facts indicating a sufficiently substantial danger . . . or that [she] knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  Farmer, 511 U.S. at 844.  Instead of presenting such evidence, however, she disputed the relevant "underlying facts" – i.e., she denied that Tatum went into the bathroom after the first assault and that he was followed by the inmates who had assaulted him by his bed (see supra p. 6).  Based on the stark inconsistencies between the parties' versions of the events on April 29, the jury

could reasonably have inferred that Jackson was deliberately lying about the events of that morning in order to cover up her misconduct. Such an inference would have been "consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (quoting Wright v. West, 505 U.S. 277, 296 (1992) (stating that if the jury had "disbelieve[d]" the defendant, "it was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt")).

The two cases cited by Jackson relating to whether the evidence established the knowledge element (Def. Br. at 12) are inapposite. In Hazelwood v. Corrections Officer Monroe et al., No. 95-Civ.-3648(DC), 1996 WL 312355, at *2 (S.D.N.Y. June 11, 1996), which involved an inmate-on-inmate assault, the plaintiff's claim was dismissed because he did not allege any facts suggesting that the individual defendant knew of a risk of harm. In that case, there was no allegation of a prior assault that might have supported such an inference. Id. at **1-2. The second case, Whitfield v. Scully, No. 94-Civ.-3290(DC), 1996 WL 706932 (S.D.N.Y. Dec. 6, 1996), involved circumstances somewhat more similar to those here: the plaintiff had been assaulted by an inmate whom he had fought with a few days earlier. Id. at **1, 3. As in this case, there was a question as to whether the defendants were on notice of a substantial risk of harm based on an earlier fight. Id. at *3 (finding that knowledge element of Section 1983 claim was not satisfied). In Whitfield, however, the plaintiff admitted that he had refused protective custody after the first fight and had told corrections officers that his dispute with the other inmate "'was over.'" Id. Here, there was no such evidence. Furthermore,

in <u>Whitfield</u>, the assaults occurred nearly a week apart, <u>id.</u> at *1, whereas in this case, the assaults occurred only minutes apart in front of the same corrections officer.

2.    <u>**There Is No Evidence that the Jury Was Confused**</u>

Jackson also asserts that the verdict "should not be permitted to stand" because "the jury was confused about the definition of 'risk of harm,'" which is an aspect of the knowledge element of the deliberate indifference claim.  (Def. Br. at 8 n.1)  Her assertion is based on a hearsay report of a conversation that Jackson's counsel had with certain jurors after they rendered their verdict, and on certain questions in a note the jurors sent out during their deliberations.  (<u>Id.</u>)  Neither the jurors' post-verdict remarks nor the jury's note during deliberations supports overturning the verdict here.

In her memorandum of law, Jackson asserts that after rendering their verdict, several jurors told her counsel that "they believed that Officer Jackson's use of profanity showed a 'breakdown of control' that could have led to plaintiff's assault." (Def. Br. at 8 n.1)  This hearsay report of jurors' post-deliberation remarks cannot be considered by the Court in deciding this motion, however.

"The jury's deliberations are secret and not subject to outside examination."  <u>Yeager v. United States</u>, 129 S.Ct. 2360, 2368 (2009).  Accordingly, Federal Rule of Evidence 606(b) explicitly "precludes . . . an inquiry into the 'mind or emotions' of deliberating jurors," <u>Manley v. AmBase Corp.</u>, 337 F.3d 237, 251 (2d Cir. 2003), and further precludes consideration of a juror's testimony "concerning the juror's mental processes in connection [/]with" reaching a verdict.  Fed. R. Evid. 606(b).  Jackson's report of the jurors' alleged post-verdict remarks goes directly to the jurors' mental processes in reaching a verdict.  Moreover, the hearsay report does not implicate any of the three limited areas into which a court may inquire in determining whether to

13

impeach a verdict based on juror testimony:  "(1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form."  Id.  Therefore, the reported "post-trial jury inquiries may not be used to impeach [the] verdict."  Campbell v. City of New York, No. 99-Civ.-5129(LTS)(THK), 2003 WL 660847, at *1 (S.D.N.Y. Feb. 27, 2003) (holding that "[i]t is well established that" "post-trial jury inquiries may not be used to impeach a verdict" "absent evidence of extraneous prejudical information or outside influence").

Similarly, the third jury note (Court Exhibit 3) does not provide a basis for overturning the verdict.  This jury note contained two questions:  "By just being inside ARDC [(part of Rikers Island)], would one be considered at risk of harm?" and "Can a breakdown of control in Mod 2 be considered 'a risk of harm?'"  (Tr. 1104:8-15; Court Ex. 3)

There is no basis to find that the jury's questions indicated confusion about the legal requirements applicable to a deliberate indifference claim.  Nor does the Court's response to the jury's note provide a basis for overturning the verdict.  Before responding to the note, the Court read it to the parties and their counsel, heard their proposals as to a response, and finally proposed re-reading to the jury the two paragraphs of the jury charge that contained the "substantial risk of harm" language (Tr. 1104:8-1106:23) – to which Jackson's counsel had raised no objection during the charge conference (see Tr. 896:23-899:3 (discussing substantive instructions)).  The Court asked the parties whether they agreed to the Court's proposed response, and all counsel,

14

including Jackson's, responded that they "were fine with" it.  (Tr. 1106:24-11:07-22)

Jackson thereby waived any objection to the Court's response to this jury note.  See

Bennaceur v. Latrenta, No. 92-Civ.-3748(LJF), 1993 WL 330497, at *3 (S.D.N.Y. Aug.

24, 1993) (party waived objection to Court's response to jury note – which consisted of

re-reading portion of jury charge – where it "did not object to the Court's initial charge

nor its rereading of the charge").

### B.      There Was Sufficient Evidence for the Jury To Find That Jackson Disregarded the Risk of Harm to Tatum

Jackson also argues that there was insufficient evidence to support a

finding that she disregarded any risk of harm to Tatum of which she was actually aware.

(Def. Br. at 10-13)  Relying on Hayes v. New York City Dept. of Corrections, 84 F.3d

614 (2d Cir. 1996) – which states that to establish a deliberate indifference claim, a

plaintiff must demonstrate that the defendant "disregard[ed] . . . [a substantial risk of

harm to the plaintiff] by failing to take reasonable measures to abate the harm," id. at 620

– Jackson contends that she is entitled to judgment as a matter of law because there is no

evidence that she could have taken steps to abate the risk of harm to Tatum, but failed to

do so.  (Def. Br. at 10)  Because there is neither a complete absence of evidence

supporting the jury's verdict on this issue, nor overwhelming evidence in Jackson's favor,

Jackson is not entitled to judgment as a matter of law.  See Galdieri-Ambrosini, 136 F.3d

at 289.

As was generally the case at trial, there was conflicting evidence

concerning Jackson's alleged efforts to stop the assault on Tatum.  Jackson testified that

she took one step to halt the first assault:  she told the inmates to stop fighting.  (See

supra p. 6)  Tatum, however, denied that Jackson told the inmates to stop, and testified

15

instead that she was cursing at him as he was assaulted.  (See supra p. 4)  While Buford

somewhat corroborated Jackson's testimony, he could only vaguely recall what he heard

her shout.  (See supra p. 7)  Thus, there was not "overwhelming evidence" that Jackson

took steps to stop the first assault.  Galdieri-Ambrosini, 136 F.3d at 289.

As to the second assault, Jackson denied that it ever occurred, and

accordingly did not offer any evidence that she took steps to mitigate the harm to Tatum

with respect to that assault.  Even if, as Jackson argues (Def. Br. at 11), it would be

unreasonable to require her to have intervened physically during the second assault, it

was undisputed at trial that she had other means of responding to inmate-on-inmate

violence that she failed to use:  Jackson testified that on April 29, she was carrying a

whistle, pepper spray, and a "personal body alarm," which she could have used to alert a

team to come assist her, but that she did not use any of these resources.[5]  (Tr. 185:3-9,

186:14-23, 187:15-22, 190:10-19)

Thus, if one credits Tatum's testimony concerning the second assault, the

evidence supports a finding that Jackson disregarded a known, substantial risk of harm to

Tatum by failing to take the reasonable steps available to her to "abate the harm" to

Tatum during the second assault.  Hayes, 84 F.3d at 620; see also O'Neill v. Krzeminski,

---

[5]  Jackson relies on Velasquez v. Bankich, No. 97-Civ.-8424(AKH), 2000 WL 1568326
(S.D.N.Y. Oct. 19, 2000), but that case is distinguishable on several grounds.  First, the
assault at issue in Velasquez occurred during a "riot situation," posing a risk to the
defendant officers' safety, id. at ** 1, 3, whereas here, there was no evidence that Jackson
faced a risk to her safety.  Furthermore, the defendants in Velasquez had taken several
steps to attempt to mitigate the harm to the plaintiff:  (1) they were attempting to remove
him from the recreational facility where the fight occurred when he eluded them and
returned to the facility; and (2) they called for reinforcements.  Id. at **1, 3.  There was
no evidence that Jackson took comparable steps here (e.g., ordering inmates not to follow
Tatum into the bathroom), and she conceded that she did not call for assistance.

839 F.2d 9, 11-12 (2d Cir. 1988) (summary judgment unwarranted on claim that defendant failed to intervene when other officers struck plaintiff three times and then dragged plaintiff across floor; although defendant had no reasonable opportunity to intervene with respect to the blows, "[h]aving seen the victim beaten, he was alerted to the need to protect [plaintiff] from further abuse," and could be held liable with respect to the dragging).

\*        \*        \*

As described above, assuming that the jury credited Tatum's version of the events over Jackson's – which it was entitled to do – there was substantial evidence supporting the jury's finding that Jackson had actual knowledge of a risk of substantial harm to Tatum, yet failed to take reasonable steps to abate that harm.  Therefore, Jackson is not entitled to judgment as a matter of law on Tatum's deliberate indifference claim. See Galdieri-Ambrosini, 136 F.3d at 289.

## III.    **JACKSON IS NOT ENTITLED TO A NEW TRIAL ON LIABILITY**

Jackson has also moved for a new trial on the deliberate indifference claim under Rule 49(b) of the Federal Rules of Civil Procedure, arguing that the jury rendered an inconsistent verdict.  (Def. Br. at 14-15)  Jackson argues that because the jury found that Tatum had not proven that Terreem Martin assaulted him, it was inconsistent for the jury to find that Jackson was deliberately indifferent to an assault against Tatum.  (Id.)

As a matter of logic, however, the verdict is not inconsistent.  It was undisputed that Tatum was attacked by more than one inmate – and seriously injured – on April 29.  (See supra p. 3)  Jackson herself testified that Tatum was in a fight with two other inmates – whom she identified as Martin and Leonard Chin – and that she did not know which of the inmates actually injured Tatum.  (Tr. 316:5-14 (Jackson testifying:

"I'm not going to sit here and say that Mr. Martin broke Stevie Tatum's jaw. . . . There

was a fight with the two inmates Chin and Martin.  It could have been Chin that broke his

jaw, I don't know."))  The jury did not need to find that Tatum had proven that Martin

was one of his assailants in order to find that Tatum was assaulted, that Jackson knew of

the risk that the assault would occur, and that she was deliberately indifferent to that

risk.[6]

Moreover, Jackson did not object to either the jury instructions or the

verdict sheet, neither of which required the jury to find that Martin had assaulted Tatum

in order to find that Jackson was liable for deliberate indifference.[7]  Jackson argues that

---

[6]  As noted earlier, Martin's defense at trial was misidentification.  (See, e.g., Tr. 988:25-989:1 (Martin's counsel stating in summation: "Our defense is simple. . . . It was not him."))  There was substantial evidence at trial casting doubt on the identification of Martin as one of the attackers.  For example, Tatum testified that the inmate who he believed to be Martin had previously been involved in a violent incident with another inmate, and had been taken away by a correction officer.  (Tr. 677:23-678:12)  However, as Martin showed, Correction Department records did not contain any references to disciplinary infractions committed by Terreem Martin, either in connection with the alleged previous incident or the incident involving Tatum.  (Tr. 678:20-679:4)

[7]  It was clear from the outset of the trial that the jury could potentially render a verdict against Jackson on the deliberate indifference claim without finding Martin liable.  The deliberate indifference instruction was the only cause-of-action instruction that did not predicate Jackson's liability on a finding that Martin participated in the assault.  (Compare Tr. 1048:2-21 (deliberate indifference instruction) with Tr. 1049:9-1049:16 (conspiracy instruction requiring jury to find "an agreement between . . . Jackson and . . . Martin"), Tr. 1052:13-18 (aiding-and-abetting excessive force instruction requiring jury to find that Jackson "knew that . . . Martin was using excessive force" (emphasis added)), Tr. 1054:6-17 (aiding-and-abetting assault and battery instruction requiring jury to find as first element "that . . . Martin committed the assault or battery")).  Similarly, the deliberate indifference question on the verdict sheet was the only question that did not require the jury to find Martin liable before considering Jackson's liability.  Prior to the time the jury rendered its verdict, Jackson did not object to the charge or the verdict sheet on the ground that the jury should not be permitted to find Jackson liable for deliberate indifference unless it found Martin liable for assault and battery.  (See Tr. 1064:20-21 (Jackson's counsel stating that there were no objections to the jury instructions); Tr. 1076:25-1078:1 (same, with respect to verdict sheet))

she properly preserved her objections on this issue by requesting special interrogatories

<u>after</u> the jury rendered its verdict (Def. Br. at 15), but Rule 49(b) provides no relief where

a party "claim[s] the jury's findings with respect to two separate causes of action are

inconsistent" – as Jackson claims here – but "never raised the potential for inconsistency

at the charging conference, nor at any time prior to the verdict being rendered."[8]  <u>Cruz v.</u>

<u>Henry Modell & Co.</u>, No. 05-Civ.-1450(AKT), 2008 WL 905356, at *6 (E.D.N.Y. Mar.

31, 2008); <u>see also</u> <u>Lavoie v. Pacific Press & Shear Co.</u>, 975 F.2d 48, 54 (2d Cir. 1992)

(Rule 49(b) does not apply at all to an "alleged inconsistency . . . between two <u>general</u>

<u>verdicts</u> on different legal theories and not between a general verdict and responses to

interrogatories").  Furthermore, Jackson has not offered any case law indicating that the

Court erred in any respect in instructing the jury as to Tatum's deliberate indifference

claim.  In sum, Jackson has not shown that she is entitled to a new trial under Rule

49(b).[9]

───────────────

[8] <u>Laborde v. City of New York</u>, No. 93-Civ.-6923(JGK), 1999 WL 38253 (S.D.N.Y. Jan.
27, 1999), relied on by Jackson, is not to the contrary.  In that case, which involved a
motion for a new trial under Rule 59 – not under Rule 49(b) – the court noted that the
defendant had waived its argument that the verdict was inconsistent by failing to raise it
at any time prior to the jury being discharged.  <u>Id.</u> at *7.  The court did not address
whether a party could avoid a waiver finding by raising an issue immediately prior to the
discharge of the jury when (1) the party had not objected to the jury charge or verdict
sheet prior to the verdict; and (2) the potential for a purportedly inconsistent verdict was
obvious at the time the jury was charged.

[9] In the introduction to her memorandum of law in support of her motion, Jackson states
that she moves in the alternative for a new trial pursuant to Rule 59.  (Def. Br. at 2)  In
the body of her brief, however, Jackson argues for a new trial on the deliberate
indifference claim only pursuant to Rule 49(b).  (Def. Br. at 14-15)  To the extent
Jackson also seeks a new trial under Rule 59 on the liability verdict, her motion is denied.
The Court may grant a new trial under Rule 59 only if it "conclude[s] that the jury has
reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, <u>i.e.</u>, it
must view the jury's verdict as against the weight of the evidence."  <u>Manley v. AmBase</u>

## IV.     A REDUCTION IN THE COMPENSATORY DAMAGES AWARD IS UNWARRANTED

Jackson also moves for a new trial on damages pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, or, in the alternative, for remittitur of the $1 million compensatory damages award.  (Def. Br. at 16)  In addition to arguing that the award was excessive (Def. Br. at 17-18), Jackson argues that the award was against the weight of the evidence insofar as it:  (1) was based on a finding that Jackson's deliberate indifference caused Tatum's pain and suffering with respect to his broken jaw (Def. Br. at 18-19); or (2) included any compensation for emotional distress, past or future lost wages, or past or future medical expenses (Def. Br. at 20-23).

### A.     Sufficiency of the Evidence

In order for the Court "to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . [that] the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence."  Manley v. AmBase Corp., 337 F.3d at 244 (internal quotations omitted).  The Rule 59(a) standard is "less stringent" than the standard for granting judgment as a matter of law under Rule 50 "in two significant respects:  (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."[10]  Id. (internal quotations omitted).

---

Corp., 337 F.3d at 244 (internal quotations omitted).  As described above, the jury's verdict was amply supported by Tatum's testimony.

[10] In some cases, the Second Circuit has stated that in deciding a Rule 59 motion for a new trial, it would "view the record in the light most favorable to . . . the party against whom a new trial is sought."  Kerman v. City of New York, 374 F.3d 93, 122 (2d Cir.

1.      **Causation**

"To recover compensatory damages under Section 1983, a plaintiff must prove that his injuries were proximately caused by the constitutional violation."  Gibeau v. Nellis, 18 F.3d 107, 110 (2d Cir. 1994) (internal citation omitted).  Accordingly, the jury was instructed that to hold Jackson liable, it must find that Jackson's "act or omission . . . was a substantial factor in bringing about or actually causing [Tatum's] injury . . . [and] the injury or damage was a reasonably foreseeable consequence of [Jackson's] act or omission."  (Tr. 1046:10-19)  The jury was further instructed that it should award Tatum compensatory damages "only for the injuries that [Tatum] proves were caused by [Jackson's] wrongful conduct."  (Tr. 1055:15-17)  Jackson did not object to these instructions (see Tr. 1064:20-21), and the jury is presumed to have followed them.  See Britt v. Garcia, 457 F.3d 264, 272 (2d Cir. 2006) ("It is a fundamental proposition that a jury is presumed to follow the instructions of the trial judge." (internal quotation omitted)).

Jackson's argument that Tatum failed to prove a causal connection between her deliberate indifference and his pain and suffering is meritless.  If the jury credited Tatum's testimony, it could reasonably have found that Jackson's deliberate indifference was a proximate cause of the fractures to Tatum's jaw and thus of the significant pain and suffering he endured as a result of those fractures.[11]

---

2004) (citing cases).  The prevailing rule, however, is the one described in Manley v. AmBase Corp., 337 F.3d 237.  See 11 Wright, Miller & Kane, Federal Practice & Procedure § 2806 (3d ed. 2009) (in deciding a Rule 59 motion, "[t]he judge is not required to take that view of the evidence most favorable to the verdict-winner").

[11] As explained above, contrary to Jackson's argument, the jury's finding in favor of Martin on the assault and battery claims does not "logically" lead to the conclusion that

Jackson's speculation that Tatum's second jaw surgery was an intervening cause between her wrongful conduct and his subsequent pain and suffering (Def. Br. at 18) is unsupported by the evidence.  Jackson did not offer expert testimony supporting her argument that a medical error during the first surgery caused the need for the second surgery.  While Tatum's medical expert conceded that "there could have been a better outcome" (Tr. 397:10-14) with respect to the first surgery – as is presumably the case with many medical procedures – he did not identify any specific medical errors made during the first surgery and stated that in his opinion, the second surgery was "directly caused" by the "trauma" Tatum suffered in April 2005.  (Tr. 377:15-19)  Similarly, Jackson did not offer any medical evidence supporting her argument (Def. Br. at 19) that Tatum's delay in obtaining treatment caused infection and exacerbated his pain.[12]  Thus, the jury's finding of causation was not against the weight of the evidence.

### 2.    Emotional Distress

Contrary to Jackson's argument (Def. Br. at 20), the weight of the evidence also supports a finding that Tatum was entitled to compensatory damages for emotional distress.  To show entitlement to such damages, "the plaintiff must establish that [he] suffered an actual [emotional] injury caused by the deprivation [of constitutional rights]."  Patrolmen's Benevolent Ass'n v. City of New York, 310 F.3d 43, 55 (2d Cir.

---

Jackson was not the proximate cause of Tatum's injuries.  (Def. Br. at 19)  It was undisputed at trial that Tatum was attacked by inmates on April 29 – whether or not those inmates included Martin – and that he was severely injured in the attack.

[12]  Against the advice of the doctor who examined him at Rikers Island, Tatum chose to return to his trial to obtain a verdict rather than go to the hospital immediately after he was examined in the prison infirmary.  (Tr. 527:14-528:3)  After receiving a not guilty verdict, Tatum walked to a hospital four or five blocks from the courthouse, where he was immediately taken in for surgery.  (Tr. 531:3-11, 532:2-6)

2002).  While "[a] plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages," such damages are properly awarded where "the plaintiff's testimony of emotional injury . . . [is] substantiated by other evidence that such an injury occurred, such as . . . the objective circumstances of the violation itself."  Id.  "Evidence that a plaintiff . . . sought medical treatment for the emotional injury" is "helpful," but "not required."  Id.

    Tatum, who had previously been diagnosed with depression, testified that he became "more depressed" while he was in the hospital following the assault, because he did not understand why he had been attacked.  (Tr. 534:9-15, 545:3-11; see also 656:7-15 (testimony that Tatum's depression "increased" after the assault))  He also testified that when he returned home with his jaw wired shut, he "suffered great shame" from his appearance, and had difficulty talking.  (Tr. 536:8-18; see also Tr. 545:18-24 (testimony that Tatum could not see his therapist immediately following the assault because he could not talk))

    The egregiousness of the assault here, and the life-altering nature of Tatum's physical injuries, provides corroboration for Tatum's testimony concerning his emotional injuries.  Tatum was assaulted while being detained for trial on a charge for which he was found not guilty.  The evidence showed that as a result of the assaults, Tatum sustained severe physical injuries that continue to affect his ability to engage in such basic daily activities as eating and laughing.  It would be "quite reasonable" for a jury to find that he suffered emotional distress as a result of his experience.  Cf. DiSorbo v. Hoy, 343 F.3d 172, 184 (2d Cir. 2003) (holding that "it would have been quite reasonable for the jury to find resulting psychological injuries" in case where female

plaintiff was beaten "by a law enforcement officer who was substantially larger and stronger than she" while "she was handcuffed and defenseless").

The fact that Tatum had previously been diagnosed with depression, and admitted that he was experiencing financial and other personal problems after his injury (Tr. 656:16-657:10), does not preclude an award of emotional distress damages.  See Mathie v. Fries, 121 F.3d 808, 815 (2d Cir. 1997) (award of emotional distress damages was appropriate despite fact that plaintiff concededly suffered emotional distress from causes other than the assault at issue).  The jury was instructed to award damages only for injuries actually caused by Jackson's unlawful conduct (see supra p. 21), and is presumed to have followed that instruction.  Britt, 457 F.3d at 272.

### 3. Lost Wages and Medical Expenses

A small award of compensatory damages for lost wages and for unreimbursed transportation expenses related to Tatum's medical appointments would not have been against the weight of the evidence here.[13]  Although Tatum offered little evidence on either issue, he did testify that he wanted to begin working in July 2005 – approximately two months after he was injured – but was told by a doctor that he could not because of his injuries.  (Tr. 550:18-19, 585:18-23)  He further testified that he was eventually "cleared to go back to work" in November 2006, and found a truck-driving job

_____

[13] The Court cannot presume that such awards were made.  The verdict sheet did not include – and Jackson did not propose – special interrogatories for different categories of damages.  (See Docket No. 77-2 (City Defendants' proposed verdict sheet))  Based on defense counsel's post-verdict conversations with jury members, Jackson asserts that the jury in fact considered Tatum's lost wages and medical expenses in deciding on the amount of compensatory damages to award him.  (Def. Br. at 22 & n.2)  As explained above, however, this hearsay report cannot be used to impeach the verdict.  (See supra p. 13)

approximately one month later – in December 2006 – that paid between $2,000 to $2,500

per month.  (Tr. 550:9-10)  Considering this testimony, it would not have been unduly

speculative for the jury to conclude that Tatum would have sought and obtained truck-

driving work within approximately one month of July 2005 if he had been able, and to

award Tatum compensatory damages of up to $40,000 for lost wages ($2500 per month

for the 16-month period between August 2005 and November 2006).[14]  The Second

Circuit has previously affirmed a lost wages award based on comparable plaintiff

testimony.[15]  See O'Neill v. Krzeminski, 839 F.2d at 13 (in Section 1983 excessive use of

force case, holding that there was "sufficient evidence of lost wages to justify" a

compensatory damage award based on plaintiff's testimony that "as a result of his

injuries he was forced to return late to his Army post and consequently fell behind his

---

[14] Weighing against this testimony was Tatum's admission that he did not work for nearly
four years prior to the assault – from August 2001, when he was in a car accident,
through April 29, 2005.  (Tr. 548:10-17)  Tatum also conceded that he did not look for
work until November 2006 and could not recall what aspect of his injuries made it
impossible for him to work until that time.  (Tr. 585:15-17, 587:3-6, 587:17-19)  The
jury, however, could have found that because Tatum did look for and obtain work once
he was "cleared" by his doctor, it was reasonable to believe that that had he been able, he
would have looked for work starting in July 2005.

[15] In support of her argument that a lost wages award was unwarranted here (Def. Br. at
20-21), Jackson relies on cases applying New York state law, under which a plaintiff's
"uncorroborated testimony as to the amount of lost past or future wages cannot, as a
matter of law, satisfy the 'reasonable certainty' standard" for awarding such damages.
Wang v. Yum! Brands, Inc., No. 05-Civ.-1783(JFB)(MDG), 2007 WL 1521496, at *5
(E.D.N.Y. May 22, 2007) (considering damages relating to New York state law
negligence claim).  In this case, however, the jury found that Jackson was liable under a
federal claim, not a New York state law claim, and Jackson did not seek, and the Court
did not give, a jury instruction concerning the New York state law "reasonable certainty"
standard.  (See Tr. 1055-1058)  Jackson has not shown that a plaintiff's testimony is
insufficient as a matter of federal law to support an award of compensatory damages for
lost wages.

class of officers," leading him to "le[ave] active service to his great disappointment soon thereafter").

   With respect to medical expenses, it would have been unduly speculative for the jury to award Tatum anything more than nominal expenses associated with transportation to medical appointments.  Tatum testified that he incurred between $100 and $150 of unreimbursed transportation expenses relating to medical appointments each month from May 2005 through November 2006, which could have supported an award of up to $2,850.  (Tr. 546:18-547:3)  The only evidence Tatum offered with respect to his actual medical expenses, however, was his testimony that his medical bills were "somewhere in the hundred thousand dollars area" and were paid for by Medicaid.  (Tr. 546:9-15)  Tatum's testimony that he believed he "would have to reimburse the state" for the Medicaid payments if he recovered money in a lawsuit (id.) was speculation and the jury could not reasonably have relied on it to find that Tatum had actually suffered a compensable financial loss in the amount of $100,000 due to medical expenses.  As noted above, however, there is no admissible evidence that the jury awarded such speculative damages to Tatum.

  **B.**  **Remittitur Is Unwarranted**

   In addition to arguing that certain specific categories of injury and loss could not reasonably have supported a damage award, Jackson argues that the $1 million award as a whole is excessive and should be reduced.  (Def. Br. at 17-18, 23)  Because the jury did not specify the categories of damages it awarded to Tatum, the Court will

consider whether the award as a whole is excessive to compensate Tatum for the injuries and losses that were supported by the evidence.[16]

"Remittitur is appropriate to reduce verdicts only in cases 'in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award.'" Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd., 930 F.2d 1021, 1027 (2d Cir. 1991) (internal citation omitted). "A remittitur, in effect, is a statement by the court that it is shocked by the jury's award of damages." Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990). To determine whether the compensatory damages award here is so high as to "'shock the judicial conscience,'" the Court must "'consider[] . . . the amounts awarded in other, comparable cases.'" DiSorbo, 343 F.3d at 183 (quoting Mathie v. Fries, 121 F.3d at 813).

"When considering whether . . . [the] award falls within a reasonable range," however, the Court "do[es] not 'balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater.'" Id. (quoting Ismail v. Cohen, 899 F.2d at 187). Where, as here, the argument for remittitur is that the award is "'intrinsically excessive,'" but the excess is "not attributable to a discernable error," the Court may "reduce the award 'only to the maximum amount that would be upheld . . . as not excessive.'" Rangolan v. County of Nassau, 370 F.3d 239, 244 (2d Cir. 2004) (internal citations omitted). Thus, the Court will "not reduce [the] . . . verdict to less than the maximum previously held to be reasonable for injuries of similar severity." Id. at 247 (emphasis added).

––––––––––––––––––––––––

[16] Because the evidence justifies only a small award for economic damages (less than $45,000), the Court's analysis focuses on whether a $1 million award for non-economic damages is supported here.

The award here is not outside the range of reasonableness.  While juries have awarded lower amounts in cases involving somewhat similar injuries, the high end of the range in comparable cases reaches $1 million.  In Ismail v. Cohen, 899 F.2d 183 (2d Cir. 1990), where the Second Circuit upheld a $650,000 award for non-economic damages,[17] the plaintiff appears to have suffered less severe injuries than Tatum.  In Ismail, the defendant police officer "struck [the plaintiff] on the back of his head without warning, causing a brief loss of consciousness," and then placed his knee in the plaintiff's back and handcuffed the plaintiff with his hands behind his back.  Id. at 185.  The plaintiff's injuries included "two displaced vertebrae, a cracked rib and serious head trauma."  Id.  Tatum, on the other hand, suffered three fractures, including a fracture of his lower jaw bone into multiple pieces; his top lip was numb for approximately a year and a half (Tr. 544:9-13); he lost 40 pounds after the first surgery and 15 pounds after the second (Tr. 551:8-23); and his teeth are loose because of "severe bone loss."  (Tr. 552:1-20; see also Tr. 379:7-11 (Dr. Sullivan's testimony that Tatum had "significant bone loss around his teeth and gum problems")).

The jury also heard evidence indicating that Tatum suffered pain and emotional distress at least comparable to that suffered by the plaintiff in Ismail, who testified that he had ongoing "chronic intermittent pain" that "interfered to some extent with his daily activities," and also suffered "considerable mental and emotional injury." Id. at 186.  Tatum testified that he was in pain for the entire year between the two surgeries, particularly when his jaws were wired shut (Tr. 535:9-15, 542:1-4); that he

---

[17]  The jury's award in Ismail "consisted of compensation for personal injury, including humiliation and injury to reputation, and pain and suffering."  Ismail v. Cohen, 712 F. Supp. 416, 420 (S.D.N.Y. 1989).

continues to suffer pain when he engages in commonplace daily activities such as yawning, laughing or going out in the cold (Tr. 539:13-540:5, 554:21-556:16, 556:23-557:25); that he cannot eat many foods because of his limited ability to chew (Tr. 554:21-556:16); and that he suffered increased depression as a result of the assaults (Tr. 534:9-15, 545:3-11).  In addition, Tatum testified that he was in "excruciating pain" while he waited for "a substantial amount of time" to be taken to the prison infirmary immediately after the assault (Tr. 521:4, 521:22-25, 523:13-524:1), and that he also endured a prolonged and painful recovery, including two eight-week periods in which his jaw was wired shut.  (Tr. 373:9-14, 374:21-375:1, 376:7-16, 377:20-22, 535:9-15)

The Ismail jury's award of $650,000 in compensatory damages is the equivalent of approximately $1,070,000 in 2009 dollars, an amount roughly equal to the award here.[18]  Id. at 186.  The Second Circuit upheld the award (and reversed the district court's remittitur order), holding that it was "within [a] reasonable range."  Id. at 187.  In light of that holding, this Court cannot conclude that the $1 million compensatory

---

[18] "[W]hen considering the sizes of the awards in earlier cases, [the Court] must take into account inflation. . . ."  DiSorbo, 343 F.3d at 185.  As other district courts in this Circuit have done, this Court has used the "Inflation Calculator" provided by the United States Department of Labor's Bureau of Labor Statistics – made available at: http://www.bls.gov/data/inflation_calculator.htm (last visited August 20, 2009) – to estimate 2009 dollar equivalents for purposes of deciding this motion.  See, e.g., Robinson v. Holder, No. 07-Civ.-5992(DLC), 2008 WL 2875291, at *8 n.3 (S.D.N.Y. July 22, 2008) (using Bureau of Labor Statistics inflation calculator); Scott v. John Doe Corp., No. 01-Civ.-5910(CBA), 2006 WL 2335542, at *3 n.3 (E.D.N.Y. Aug. 10, 2006) (same).  The inflation calculator cited by Tatum (Margolis-Ohnuma Aff. ¶ 19 n.6), which uses an annual inflation rate of 2.57% per year, gives a similar estimate for the Ismail award, equating $1,053,000 dollars in 2009 with $650,000 in 1990.  See http://www.wolframalpha.com/input/?i=%24650000+%281990+dollars%29.

damages award here warrants remittitur.[19] Rangolan, 370 F.3d at 244 (court may not order remittitur below high end of range of awards in comparable cases).[20]

### CONCLUSION

For the reasons stated above, Defendant Jackson's motion for judgment as a matter of law or, in the alternative, for a new trial, and for a reduction in the compensatory damages award (Docket No. 96) is DENIED.

Dated: New York, New York
      November 2, 2009

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[19] The Court's conclusion would be the same even if it had found that the weight of the evidence did not support an award for lost wages and/or unreimbursed transportation expenses.

[20] The most comparable case cited by Jackson is Hygh v. Jacobs, 961 F.2d 359 (2d Cir. 1992), an excessive force case. There, a single blow to the plaintiff's cheek had caused a fracture to his cheekbone, requiring plastic surgery and resulting in permanent nerve damage and numbness. Id. at 361. The jury awarded $216,000 in compensatory damages for that claim – approximately $330,000 in 2009 dollars. Id. at 362. The district court denied the defendant's motion for a new trial, and the Second Circuit affirmed, agreeing that the damages award was "not unreasonable." Id. at 366. Because there was no reduction of the award, however, Hygh does not stand for the proposition that $216,000 is the highest amount that is reasonable for comparable injuries. In any event, Hygh is not on point because Tatum's injuries are much more severe than those of the Hygh plaintiff: Tatum suffered three fractures, not one; required two surgeries – not one – and had to endure two eight-week periods during which his jaw was wired shut; and has ongoing pain, loss of teeth, and inability to chew properly. The jury could also have found that Tatum was subjected to two separate assaults, rather than a single blow as in Hygh, resulting in greater emotional distress.